IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


MATTHEW WILSON,                                    Case No. 1:16-cv-00855-CL

　　　　　　　Plaintiff,

　　　v.

　　　　　　　　　　　　　　　　　　REPORT & RECOMMENDATION

DECIBELS OF OREGON,
INC., and DENNIS
SNYDER,

　　　　　　　Defendants.

_____

CLARKE, Magistrate Judge.

　　　Plaintiff alleges violations of state and federal overtime laws. Plaintiff's overtime claims are brought pursuant to the Fair Labor Standards Act ("FLSA") and related Oregon state statutes. In addition to these claims, plaintiff brings claims for wrongful deduction of wages, which are brought exclusively under Oregon law. Before the Court are the parties' cross-motions for summary judgment (#72, #76). For the reasons discussed below, Defendants' motion (#72) should be granted in part and denied in part and Plaintiff's motion (#76) should be denied.

## EVIDENTIARY OBJECTIONS

### I.　　Disciplinary forms and other evidence showing failure to follow company rules

　　　Defendants submitted numerous disciplinary forms and e-mails purporting to show Plaintiff routinely failed to adhere to Decibels' timekeeping policies, failed to show up to work on time, was routinely absent from work, and neglected to comply with additional company-

wide policies. *See* First Livett Decl. Ex. A, at 35-57 [ECF No. 73.]. Plaintiff objects to Defendants' submission of this evidence, arguing these records are irrelevant and impermissible character evidence.

First, the evidence is relevant. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Fed. R. Evid. 401. Evidence, although relevant, may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The balance test required to determine the relevancy and admissibility of evidence under these two provisions is in the sound discretion of the trial court. *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087-88 (9th Cir. 2005).

Defendants argue Plaintiff failed to follow rules requiring that technicians fill out timecards and daily logs in order to properly track their hours worked. Accordingly, this evidence, which purports to demonstrate Plaintiff's failure to follow these as well as other company rules, is plainly relevant in helping the factfinder assess the merit of Defendants' argument. Any negligible prejudice created by this evidence is insufficient to warrant excluding the evidence, which, as stated, bears directly on one of Defendants' key arguments.

Nor is the evidence impermissible character evidence. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). However, the evidence may be admitted to show "a person's habit or . . . routine practice . . . to prove that on a particular occasion the person . . . acted in accordance with the habit or routine practice." Fed. R. Evid. 406. Here, Defendants' evidence is being used to prove that Plaintiff had a habit of routinely

failing to follow company rules and that his purported failure to fill out timecards and adequately report his hours was in accordance with this habit. This evidence is therefore admissible.

## II.    Leo Brown's declaration

Plaintiff next objects to paragraph nine of Leo Brown's declaration. Plaintiff argues the statement is conclusory, vague, without foundation, and does not identify any individual or technician; he also contends the statement is hearsay and not made from Mr. Brown's personal experience. Mr. Brown, who has been Decibels' director of operations for the past eight years, states:

> With limited exception, Decibels does not restrict how technicians can use their time between jobs, and technicians are generally free to do as they please. Technicians spend their time between jobs in a variety of ways. For example, some technicians go home, some technicians go to the park and smoke cigarettes, and some technicians just go and sit and wait at the next job.

Brown Decl. ¶ 9 [ECF No. 75.].

Mr. Brown's statement is admissible. First, Mr. Brown is simply stating what the company's policy is and providing examples of how installation technicians spend time between jobs; the Court fails to see how Mr. Brown could have provided more detail in his statement. Second, this statement is not hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Here, Mr. Brown does not refer to *any* outside statement; thus, it cannot be hearsay. Finally, there is nothing to suggest this statement was made from anything other than Mr. Brown's personal experience. As stated, Mr. Brown has been Decibels' director of operations for the past eight years. Given this extensive background with the company, it hardly seems he would not be privy to the way Decibels' does or does not restrict technicians' time in between installation jobs as well as how technicians spend that time. Nor does Plaintiff articulate why he believes Mr. Brown lacks the firsthand experience to make

this statement. Accordingly, Plaintiff's objection is overruled, and paragraph nine of Mr. Brown's declaration is admitted.

## FACTUAL BACKGROUND

Plaintiff was formerly employed as a senior installation technician ("technician") with Defendant Decibels of Oregon, Inc. ("Decibels"). He was initially hired in October 2012, later resigned in June 2014, but was rehired in October 2014. Decibels later terminated him in January 2016 for attendance- and performance-related problems. Installation technicians such as Plaintiff are employed to perform home installation of Internet, cable television, and phone services for Decibels' client, Charter Communications ("Charter").

### I. Pay structure

Decibels pays technicians in part via a piece-rate pay system, whereby technicians are paid based on the number of successful installation jobs they complete rather than the number of hours they work. However, state and federal law requires Decibels, and all employers using a piece-rate system, to track all hours worked, not simply the number of installation jobs completed; this requirement is to ensure that employees' regular hourly rate, which is arrived at by dividing total earnings per week by the total number of hours worked in that week, does not slip below minimum wage. 29 C.F.R. § 778.111; OAR § 839-020-0030(3)(b). Decibels thus tracks hours worked predominately through the use of two different forms: daily reports and timecards.[1] As Leo Brown ("Brown"), Decibels' director of operations, explains, "Daily reports correspond to particular installation jobs, and technicians are required to record their time on each installation job and at least 15 minutes of travel time between jobs on their daily reports." Brown Decl. ¶ 8. By contrast, "Timecards are used to track hours worked other than on

---

[1] Technicians' time is also tracked via TechNet software and work orders; however, as will be explained, these timekeeping devises were not necessary for payroll calculation.

installation jobs or traveling between installation jobs—for example, time spent at the dispatch office in the morning or at the end of the day, in meetings, in training, or on jobs that 'go down.'"[2] Brown Decl. ¶ 8.

Technicians are paid for these additional, non-installation hours; however, instead of being paid per job completed, they are paid on an hourly basis—currently $10 per hour—for "non-piece-rate tasks." Brown Decl. ¶ 3. Indeed, Brown states in his deposition that Decibels was and is "paying [] time on job, the travel time, and any time cards that are submitted for jobs that go down and other things []." Brown Dep. 76:21-24. According to Brown, "[A]ll technicians go through a training period, during which they are trained on various Company expectations and policies," which includes instruction on the proper procedures necessary to adequately record hours worked in daily reports and timecards and thus to ensure they are adequately paid for every hour worked. Brown Decl. ¶ 8.

During his time as a Decibels technician, Plaintiff was required to arrive at the company warehouse by 7:15 a.m. every workday morning in order to pick up the necessary equipment for the day; the only exception was that every other Thursday technicians were required to show up at the warehouse by 7:00 a.m. for a biweekly safety meeting. *See* First Livett Decl. Ex A, at 21-22. Eric Edwards ("Edwards"), Decibels' technical operations manager, explains that, during the 7:15 a.m. morning check-in process, technicians would turn in their previous day's daily reports to the warehouse attendant, who was tasked with collecting technicians' paperwork and supplying technicians with whatever equipment was necessary for the day ahead. *See* Edwards Dep. 67:2-24; 68:15-24.

Brown states, "The amount of time that technicians need to be at the [warehouse] in the morning . . . is very brief . . . [and] should take five minutes or less." Brown Decl. ¶ 10. Thus,

---

[2]An installation job that "goes down" refers to an installation that was unsuccessful.

Decibels' position is that this time is de minimis, so technicians do not typically fill out timecards—and therefore are not compensated—for morning check-ins. Nevertheless, Brown explains that Plaintiff was entitled to fill out a timecard reflecting how much time he spent at the warehouse on a particular morning "for purposes of payment." Brown Dep. 91:24-92:6. Any hours not properly reported on a timecard, Brown said, would not be counted toward total hours worked.

Plaintiff testified, however, that "I would fill out a time card in the morning when I arrive at the warehouse . . . , for the 45 minutes to an hour, depending on what time I arrived at the warehouse," but "each time I was told that my time starts when I get my first job. So essentially my time cards were thrown out." Wilson Dep. 66:19-24. Plaintiff also testified that he witnessed Decibels management throwing his timecards in the trash. Defendants dispute this; they contend Plaintiff was paid for any hours he correctly recorded on timecards and that he received training on when and how to submit timecards but routinely failed to adhere to Decibels' timekeeping policies and "frequently failed to correctly fill out his daily reports, rarely submitted timecards, and did not submit timecards at all for the time spent at the dispatch office in the morning. . . ." Brown Decl. ¶ 8. Defendants submitted sixteen timecards that were filled out by Plaintiff, fifteen of which were approved by supervisors. *See* Sec. Livett Decl. Ex. 1, at 15-30 [ECF No. 86.]. Therefore, Defendants assert, Plaintiff was well aware of the timecard policy but simply chose not to fill out timecards for morning check-ins.

In addition to morning check-ins, every Tuesday, technicians are required to "return any unused equipment or equipment customers have returned" to the company warehouse at the end of the workday. Brown Decl. ¶ 10. Brown described this task, referred to as "refresh," as "very short. Technicians just return [] equipment" and, "[l]ike in the mornings, technicians are not

required to stay at the dispatch office for any length of time; in fact, "the actual 'refresh' should take five minutes or less." Brown Decl. ¶ 10. Consequently, as with morning check-ins, Defendants argue time spent engaging in "refresh" is de minimis; however, should a technician seek to record and be paid for the time spent at "refresh," he or she may do so by filling out a timecard. Plaintiff argues, however, that, as with morning check-ins, the time spent at "refresh" varied considerably and was often much longer than Defendants represent, yet Defendants did not keep any records of the amount of time technicians spent at "refresh."

After morning check-ins, Plaintiff would drive to his first installation job. The time spent on an installation job is referred to as "on-job time[]," Edwards Dep. 126:9, and technicians such as Plaintiff record this time in their daily logs. Additionally, technicians fill out a document called a work order and their jobs are tracked in Decibels' TechNet software program; on the work order form, technicians record the time when they arrive at their first job until completing the day's last installation job. All three forms of timekeeping are used to assess the amount of hours technicians worked and the amount of jobs completed and thus their pay. As Edwards explains, however, unlike the daily logs, the work orders and TechNet software are "not necessary" for calculating payroll, "but [are] something we use for checks and balances." Edwards Dep. 24:19-20. In addition to logging the time spent on each installation job, technicians are also instructed to record "at least 15 minutes of travel time between jobs on their daily reports." Brown Decl. ¶ 8. Plaintiff disputes this and argues technicians are only credited a maximum of fifteen minutes of travel time between jobs, if at all. Plaintiff contradicts this argument in his deposition, however, where he acknowledges that on at least one occasion he was credited 1.25 hours' drive time between Gold Beach, Oregon, and Brookings, Oregon. *See* Wilson Dep. 118:12-25.

During the day, technicians occasionally become available to take on additional installation jobs. If so, technicians switch their status in Decibels' TechNet software program to "available." Edwards Dep. 178:11-22. As Edwards explains, "[T]he available status means that they [technicians] are available to take an additional assignment[.]" Edwards Dep. 178:19-20. Moreover, if available for additional work, technicians are "instructed and expected to call in to the office for more work." Edwards Dep. 179:5-6. After doing so, the technicians wait for more work. While waiting, Edwards states that "they are waiting in their truck, waiting to get assigned a job," and must "be ready to go to work essentially as soon as the next job comes in. . . ." Edwards Dep 179:18-25. It is undisputed that Decibels did not pay Plaintiff for time waiting between jobs. It classifies such time as "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes," thereby vitiating Decibels' obligation to compensate Plaintiff for this time. 29 C.F.R. § 785.16(a).

Finally, at the end of each day, technicians such as Plaintiff are required to contact Decibels' dispatch office and request to go "end of day." At which point, Decibels contacts Charter and Charter then "clears the technician to go home or to go [end of day]." Edwards Dep. 59:9-10.

## II.    Overtime

Brown explains that "[f]or all properly recorded hours in a workweek [] in excess of 40, Decibels pays technicians an overtime premium, in addition to the regular piece rate and hourly pay." Brown Decl. ¶ 5. Decibels' "overtime premium is calculated at 0.5 times the technician's regular hourly rate." Brown Decl. ¶ 5. Hence, as Brown sets forth in his deposition:

> A: Somebody works 50 hours. Say they made $500.
> Q: Uh-huh.

> A: So the ten hours of overtime. The 50 hours would be divided into the 500 for $10 an hour. So they were paid 50 hours of straight time for $500. The half-time of $10 would be five dollars times the ten hours [of overtime] would be $50 for a total of $550.

Brown Dep. 107:14-20. Plaintiff's payroll records reflect this. *See* Brown Decl. Ex. C. Thus, for weeks that he logged overtime hours, Plaintiff's pay stub shows that he was paid a regular rate for *all* hours worked, including hours in excess of forty, plus an additional .5 times his regular rate for those hours in excess of forty. Plaintiff argues, however, he was not adequately compensated for overtime hours worked because Defendants did not compensate Plaintiff for all "work time," as defined by the FLSA. Because they failed to compensate for all "work time," they undercounted his regular rate and thus his overtime rate.

### III.   Cell-phone and tools and equipment deductions

"All technicians are required to have a company cellphone so that they can respond to customer and dispatch calls." First Skillman Decl. ¶ 5 [ECF No. 74.]. Defendants state that technicians are given the option of using the cell phone for business purposes only and retaining a personal phone for private purposes or using the company cell phone for business and personal use. "If the technician only uses the cellphone for business purposes, Decibels provides the cellphone to the technician at no cost," but the technician is obligated to submit a "call log" demonstrating the phone was used only for business purposes. First Skillman Decl. ¶ 5. On the other hand, if the technician chooses to use the phone for both personal and business purposes, "Decibels deducts approximately $35 a month of the cost ($17.50 per two-week pay period) from the employee's paycheck." First Skillman Decl. ¶ 5. The $35-per-month charge represents "a portion of Decibels' total cost," which is in excess of $50 per month per phone. First Skillman Decl. ¶ 5. Decibels records these deductions in its books, and the $35 is paid directly to Verizon Wireless, Decibels' cell-phone provider.

Plaintiff used his cell phone for business and personal calls; therefore, he signed a form acknowledging that he "will be charged $35.00 per month, at $17.50 per paycheck." First Livett Decl. Ex. A, at 27-31. He contends, however, that this set-up was unlawful because the form he signed indicated Decibels would "charge" plaintiff $35.00 per month, not "deduct" $35.00 from his paycheck. He also opines that this policy was not for his benefit and was not voluntary.

In addition to deducting monthly cell-phone expenses from technicians who choose to use their phone for personal and business purposes, Decibels expects all technicians "to pay for tools and equipment that [technicians] los[e] or damage[]." First Skillman Decl. ¶ 6. In doing so, technicians have two options: they can purchase replacements themselves, or they can sign "a deduction form authorizing Decibels to deduct the replacement cost from [technicians'] paycheck so that Decibels c[an] replace the tool or equipment." First Skillman Decl. ¶ 6. Defendants point out that authorizing Decibels to purchase replacement tools or equipment is advantageous for technicians because Decibels is in a position to purchase tools and equipment in bulk and therefore usually at a discount. Hence, "the cost to plaintiff [and other technicians] was significantly less than what he might otherwise have paid." First Skillman Decl. ¶ 6. Decibels asserts that any deductions taken from technicians' paychecks are paid directly to the tools or equipment supplier and are recorded in Decibels' books.

Defendants also assert that "Plaintiff lost and damaged tools and equipment multiple times during his employment." First Skillman Decl. ¶ 6. And, indeed, there are numerous "Voluntary Employee Payroll Deduction" forms in the record showing Plaintiff authorized deductions for lost or damaged tools and equipment from his paychecks. *See* Kuranz Decl. Ex. 15 [ECF No. 77.]. According to Plaintiff, however, these deductions were not truly voluntary; he asserts that "it was a sign-or-get-fired kind of a situation." Wilson Dep. 84:3. In fact, he was told

that he "had to sign it or, you know, they will take other actions. And [it was] implied that it would be termination." Wilson Dep. 84:9-11. Moreover, Plaintiff contends that the money is not in fact paid to the equipment supplier but to Decibels. He points to Edwards' deposition, where Edwards explains the charge "would be on the authorized payroll deduction for reimbursing Decibels." Edwards Dep. 164:3-4. Plaintiff also maintains that Decibels keeps no records reflecting how much it actually paid for the tools and therefore whether the amount it deducted from Plaintiff's paycheck was the true cost of replacement.

Next, Plaintiff points out that Defendants deducted costs for lost or damaged tools and equipment prior to procuring his authorization or without his authorization and also erroneously deducted costs from his paychecks. Defendants do not dispute this, but instead point to the fact that they reimbursed Plaintiff for any erroneous costs and Plaintiff ultimately authorized all deductions.

Finally, Plaintiff argues these charges were not deducted for his benefit but rather to benefit Decibels. In support, he points to a wage deduction for the cost of damages Plaintiff allegedly caused to a customer's Xbox. Kuranz Decl. Ex. 15, at 10. By charging him for these damages, Plaintiff asserts Decibels was relieved from the burden of having to file an insurance claim, while he received no benefit whatsoever.

## IV.    Plaintiff's claims

Plaintiff claims Defendants' timecard policy did not adequately record every hour technicians such as him spent engaging in non-installation activities. Because Defendants were required by state and federal law to accurately track these "work time" hours, Plaintiff argues Defendants' pay structure was improper. Indeed, as he asserts, "[P]laintiff [was] not compensated for overtime hours worked because defendants did not include time spent in

preparing and concluding activities, travel time between jobs, or wait time between dispatched jobs in defendants' calculation of overtime." Fist Am. Compl. ¶ 24.

In addition, Plaintiff contends that if Defendants had properly counted all of his work time, his lawfully required wage would have been much higher and therefore he was not in fact paid 1.5 times his regular rate for hours he worked in excess of forty. Finally, he brings state-law claims for what he contends were unlawful deduction of wages due to the aforementioned cell-phone and tools and equipment deductions. As mentioned, both parties have moved for summary judgment on each of these claims.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

### I.      Whether Defendants properly recorded all hours Plaintiff worked

As discussed, Defendants pay technicians such as Plaintiff via a piece-rate pay system in which technicians are paid based on the number of successful installation jobs they complete. Both Oregon and federal law permits the utilization of a piece-rate pay system. 29 C.F.R. § 778.111; OAR § 839-020-0030(3)(b). Technicians are also paid an hourly rate for other, non-installation tasks, like attending Thursday safety meetings or for jobs that "go down." Plaintiff does not take issue with this bifurcated payment scheme; instead, he argues that he was not compensated for overtime hours worked because, despite claiming to do so, Defendants did not in fact "include time spent in preparing and concluding activities, travel time between jobs, or wait time between dispatched jobs in defendants' calculation of overtime." Fist Am. Compl. ¶ 24. He argues this was in violation of the FLSA and Oregon's wage-and-hour law.

#### A.   The FLSA

"Congress enacted the FLSA in 1938 with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (alteration in original) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)). The FLSA requires employers to compensate employees for all hours of work time. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003). "[W]ork not requested but suffered or permitted [by the employer] is work time." 29 C.F.R. § 785.11. Further, the FLSA mandates that "employers [] compensate employees for hours in

excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Christopher*, 567 U.S. at 147 (citing 29 U.S.C. § 207(a)).

Plaintiff argues that Decibels' timecard policy was insufficient to track and thus compensate all hours worked each week.[3] In fact, he asserts that his timecards for morning check-ins were thrown out, that Decibels did not track time spent at "refresh," and did not track wait time between installation jobs. Thus, Decibels had no accurate measure of the number of hours Plaintiff worked each week. Because Decibels did not accurately track the hours Plaintiff worked, he contends he was not compensated for all hours that he in fact worked in excess of forty.

In many respects, Plaintiff's case is similar to *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981). There, the plaintiff asserted that the defendant failed to properly track his hours and thus to pay him the overtime he was entitled. *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F. Supp. 630 (D. Or. 1979). The court determined, however, that the plaintiff failed to accurately report his alleged overtime on his timesheets. *Id.* Indeed, as the court explained, "[T]he plaintiff [was paid] on the basis of [] weekly time sheets prepared by the manager of the bakery department." *Id.* at 631. The plaintiff "knew that overtime was supposed to be reported on the time sheets and that the store regularly paid for such reported overtime." *Id.* In fact, the plaintiff "was paid for all of the overtime he reported. . . ." *Id.*

As the Ninth Circuit explained on appeal, "[T]he officials of Roth's [the defendant] stated in their affidavits that they had no knowledge that [the plaintiff] had been working uncompensated overtime hours," as the plaintiff did not report the hours on his timesheets.

---

[3]Plaintiff also argues no timecard policy exists. Plaintiff has supplied no evidence to support this statement, other than simply arguing that Decibels' employee handbook does not contain this policy and by pointing to internally inconsistent declarations from other technicians. Moreover, the evidence shows Plaintiff himself submitted at least sixteen timecards over the course of his employment with Decibels. Hence, the evidence aptly demonstrates the existence of a timecard policy.

*Forrester*, 646 F2d at 414. Hence, because "[a]n employer must have an opportunity to comply with the provisions of the FLSA," and because the plaintiff prevented his employer from acquiring knowledge of his overtime hours, the plaintiff's claim failed. *Id.* at 414-15. The Ninth Circuit noted, however, that its holding does not allow "an employer" to "escape responsibility by negligently maintaining records required by the FLSA, or by deliberately turning its back on a situation." *Id.* at 414.

Here, as in *Forrester*, Plaintiff was required to track his hours using daily reports and timecards (*i.e.*, timesheets).[4] Like *Forrester*, Plaintiff knew he was supposed to track his hours, including overtime, on these two forms; Plaintiff's awareness of this policy is confirmed by the fact that he submitted numerous timecards to Decibels during his employ. *See* Sec. Livett Decl. Ex. 1, at 15-30. Moreover, Plaintiff's paystubs aptly demonstrate that he was paid for reported overtime.[5] *See* Brown Decl. Ex. C. Finally, like the officials for the defendant in *Forrester*, Brown states that, to the extent Plaintiff did work overtime hours in excess of those acknowledged on his paystub, Decibels had no knowledge of this because Plaintiff "frequently failed to correctly fill out his daily reports, rarely submitted timecards, and did not submit timecards at all for the time spent at the dispatch office in the morning and on 'refresh.'" Brown Decl. ¶ 8. Therefore, Defendants maintain they had no opportunity to comply with the FLSA's overtime requirements because Plaintiff's failure to follow company policy precluded it from acquiring knowledge of the extent of his overtime hours.

---

[4]Plaintiff argues that Decibels' requirement that employees fill out timecards violated the FLSA because the requirement that employers "make, keep, and preserve" records of employee hours is a non-delegable duty. *See* 29 U.S.C. § 211(c) ("Every employer . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment. . . .) Decibels did not delegate its duty to "make, keep, and preserve" records by requiring employees to fill out timecards; Decibels was still obligated to track all hours employees worked by collecting and adding together all timecards and other forms of timekeeping mechanisms, such as daily reports. There is nothing in the FLSA that precludes an employer from requiring employees to fill out timecards, as Decibels did here. In fact, the employer in *Forrester* did just that.

[5]As explained in greater detail below, Defendants properly paid Plaintiff 1 ½ his normal rate of pay for all overtime that was recorded.

Page 15 – REPORT AND RECOMMENDATION

As the court stated in *Forrester*, however, an employer may not escape liability by claiming lack of knowledge if they negligently maintained records required by the FLSA. And, here, questions of fact remain regarding whether Decibels adequately maintained records of all hours Plaintiff worked.

First, Plaintiff challenges Defendants' argument that he simply failed to follow company policy; instead, he testified that Decibels management would not allow technicians to fill out timecards—and thus track hours—for morning check-ins. *See* Wilson Dep. 66:19-24. In support of his argument, he submitted declarations from other technicians, who also maintain that Decibels did not allow them to record time spent at the warehouse each morning. These declarations also indicate that Decibels did not allow technicians to record time spent at "refresh" each week. Hence, Plaintiff argues, Decibels did not track this work time and thus compensate these hours.

Defendants attempt to rebut this argument by claiming that time spent at morning check-in and at "refresh" was de minimis; they point to Brown's declaration to support this argument, in which he states both activities should take no longer than five minutes. While the Ninth Circuit has held that the "7 to 8 minutes" employees spent "reading [a] log book and exchanging information" was "*de minimis* and therefore not compensable," *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984), Plaintiff has submitted evidence—and thus raised a genuine dispute—suggesting morning check-ins and "refresh" obligations often lasted much longer, sometimes more than an hour.[6]

---

[6]Defendants contend that to the extend Plaintiff spent additional time at morning check-ins or at "refresh," he did so strictly to socialize, not to engage in "work time." While this may be true, the Court cannot weigh Defendants' contentions against Plaintiffs' evidence—in the form of his own deposition testimony and supportive declarations from fellow technicians—that suggests he was obligated to stay much longer; for instance, Danny Wilson suggests morning check-ins lasted an hour. Danny Wilson Decl. ¶ 4 [ECF No. 80.]. Plaintiff also suggested this during his deposition. *See* Wilson Dep. 66:19-24 (suggesting morning check-ins would take forty-five minutes to an hour).

There can be no dispute that this time, if not de minimis, would constitute "work time." In *Alvarez*, the court explained that the donning and doffing of gear at the employer's plant, which was required by law, the employer's rules, and by the nature of the work, was "necessary to the principal work performed" by the plaintiff and thus was compensable "work time."[7] *Alvarez*, 339 F.3d at 903. Similarly, here, Decibels required Plaintiff to arrive at the warehouse each morning by 7:15 a.m. in order to obtain the equipment that was necessary to fulfill his principal installation activities. Just as in *Alvarez*, then, this work, which was required by Decibels' rules, was necessary to Plaintiff's principal work, rendering it compensable "work time" under the FLSA. Accordingly, if not de minimis, Defendants' failure to track these otherwise compensable hours would result in a violation of the FLSA, as Plaintiff would not have been compensated for all hours of "work time." *See id.* at 902 (stating that employers are required to compensate employees for all "hours worked") (internal citation and quotation omitted). Therefore, when viewed in the light most favorable to Plaintiff, a question of fact remains as to whether Defendants complied with this aspect of the FLSA.

Finally, as further evidence that Defendants failed to compensate Plaintiff for all hours worked, Plaintiff points to the fact that Defendants knowingly omitted wait time from hours worked. As discussed, it is undisputed that Decibels did not pay Plaintiff for the time he spent waiting between installation jobs. Defendants argue that this wait time did not count as hours worked because Plaintiff was able to use such time for his own purposes, and "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to

---

[7]The court ultimately concluded, however, that the time was de minimis. *Alvarez*, 339 F.3d at 903.

use the time effectively for his own purposes" obviate an employer's obligation to compensate an employee for this time. 29 C.F.R. § 785.16(a).[8]

In support of their contention that Plaintiff was not entitled to pay for wait time, Defendants point to three pieces of evidence. First, they argue that Plaintiff's own testimony demonstrates he had no meaningful restriction between installation jobs:

> Q: But as long as you were heading in the general direction of the next job, you could pretty much stop and hang out wherever you wanted?
> A: Essentially. Like so if I had a job at Ashland, and I'm already in Ashland, I pretty much had to stay in Ashland until it was time. I wasn't able to go home for my downtime.
> Q: Other than that, being able to go home, were there any particular limits on how you could use your downtime?
> A: Not that I can really recall.

Wilson Dep. 95:15-25. Second, Defendants point to Brown's declaration, where he states that "Decibels does not restrict how technicians can use their time between jobs" and that "technicians are generally free to do as they please." Brown Decl. ¶ 9. Third, Defendants direct the Court to the fact that Plaintiff was paid on a piece-rate basis; this form of pay, Defendants argue, "further demonstrates that [Plaintiff] did not characterize waiting time as work." Defs.' Mot. for Summ. J., at 13.

The FLSA requires that employers pay employees the federal minimum wage for time spent "engaged in commerce or in the production of goods for commerce," "or [] employed in an enterprise engaged in commerce or in the production of goods for commerce[.]" 29 U.S.C. § 206(a), (b). An employee's wait time is compensable if the employee was "'engaged to wait,'"

---

[8]Plaintiff also argues that, even if wait time was indeed non-compensable, by omitting wait time from their total calculation of technicians' hours worked each week, Defendants violated the FLSA as a matter of law, since the statute requires employers to maintain records of their employees' hours of employment. 29 U.S.C. § 211(c). Plaintiff maintains that this requirement even includes hours in which the employee was not compensated. Aside from citing the statute, Plaintiff provides no support for this interpretation of the FLSA. Rather, the plain intent of the statute is to require employers to track employees' hours worked—*i.e.* hours spent employed. If the employee was not engaged in work time, the FLSA does not require the employer to record this time. *See Ruffino v. N. Slope Borough*, No. 92-36866, 1994 WL 201174, at *4 (9th Cir. May 23, 1994) (stating "The FLSA requires employers to keep accurate records of *employee hours worked*) (emphasis added).

but not if the employee was "'wait[ing] to be engaged.'" *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)). Put differently, an employee's wait time is compensable if he is "unable to use the time effectively for his own purposes." 29 C.F.R. § 785.15. This inquiry is necessarily fact-intensive, but in evaluating the facts, two factors are to be considered: "'(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'" *Berry v. Cty. of Sonoma*, 30 F.3d 1174, 1180 (9th Cir. 1994) (quoting *Owens*, 971 F.2d at 350).

In this case, there is a genuine dispute as to whether Plaintiff's wait time was compensable. While Plaintiff did indicate he had no particular limits during his downtime, at other times in his testimony, Plaintiff explained that he would essentially "sit and wait" for the next job and that technicians were unable "to go do errands or use the time for personal use." Wilson Dep. 94:10-12. In addition, he stated that he was precluded from leaving the general vicinity of his next job and that he had to be "sitting there waiting by the company rig." Wilson Dep. 95:10-11. This inability to effectively use downtime for personal purposes is corroborated by Edwards, who states:

> Q: And so if a technician doesn't have a job to go to, and they are on available status, what is it that the technician is permitted to do?
> A: The technician is instructed and expected to call in to the office for more work.
> Q: Okay. And then when the technician does that, are they then waiting for more work?
> A: Yes.
> Q: And what is it that they are—that they are permitted to do while they were waiting for more work? Can they go to the bar and have a drink?
> A: Oh, absolutely not.
> Q: What is it that they can do? Can they sit in the truck?
> A: They are waiting idle—can you ask it differently.
> Q: Yeah. I think, you know, they are waiting in their truck, waiting to get assigned a job. Is that an accurate statement?

A: That's accurate.
Q: Okay. And they have to be ready to go to work essentially as soon as the next job comes in typically; is that fair?
A: Yes, with travel time consideration.

Edwards Dep. 179:2-25. Thus, Edwards' testimony, in contrast with Brown's, tends to demonstrate technicians are in their trucks and "engaged to wait" for the next installation job, rendering their time compensable; indeed, as Edwards testified, technicians are obligated to be ready to work as soon as the next job becomes available.

In *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d. 1078, 1091 (D. Ariz. 2010), the plaintiffs presented evidence that they were required to stay in a geographical area near a bus stop "and were unable to use their time effectively for their own purposes." In fact, "While Plaintiffs were able to frequent food vendors, stores, and other facilities within the vicinity, these activities" were deemed to be predominately "'time-filling' activities." *Id.* (internal citation omitted). The court therefore reasoned that the plaintiffs lacked sufficient freedom to engage in personal activities, a prerequisite to a finding that the time was non-compensable. *Id.*

Likewise, here, much akin to the plaintiffs in *Jimenez*, who had to wait by the bus stop, Edwards' and Plaintiff's testimony indicate Plaintiff had to wait in or near his truck and could not use his time to run errands or for other personal purposes. And while Plaintiff was permitted to take smoke breaks or go buy lunch at a store or restaurant, *see* Brown Decl. ¶ 9, he was nonetheless required to stay within the vicinity of the company truck and be prepared to return to work as soon as the next job became available. Hence, as in *Jimenez*, such "time-filling" activities do not render the time between installation jobs non-compensable.

As the *Jimenez* court explained, however, "Determining the degree of freedom . . . does not end the Court's analysis. The other 'predominant factor[]' is the agreements between the parties." 742 F. Supp. 2d. at 1091(alteration in original) (internal citation omitted). In assessing

the agreement(s) between the parties, courts must examine the "'construction of the agreements between the particular parties, . . . their practical construction of the working agreement by conduct, [and] consideration of the nature of the service.'" *Id.* (quoting *Skidmore*, 323 U.S. at 137). The Ninth Circuit has recognized three types of agreements between employers and employees: an express agreement, an agreement pursuant to a collective-bargaining agreement that compensates "call-in work" but not "off-duty time," or a constructive agreement. *Berry*, 30 F.3d at 1180 (internal citation and quotation omitted).

Here, Defendants assert that because Plaintiff was paid on a piece-rate basis, a constructive agreement arose whereby Plaintiff agreed Defendants would not compensate him for wait time. "A constructive agreement may arise if employees have been informed of the . . . compensation policy and continue to work under the disclosed terms of the policy." *Id.* (internal citation omitted). In *Berry*, the Ninth Circuit explicitly held that "[a]n agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work." *Id.* at 1181. Conversely," the court stated, "an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work." *Id.* From this language, Defendants argue that because Plaintiff was never paid for wait time, the parties characterized the time between installation jobs as wait time, not as time worked.

While Defendants' is one plausible interpretation of the evidence, and one that would permit a factfinder to conclude Plaintiff was not entitled to compensation for wait time, the Court believes there is sufficient ambiguity as to the substance of the parties' supposed constructive agreement to preclude summary judgment. In *Jimenez*, the court also determined that summary

judgment was inappropriate because of the lack of clarity regarding the parties' alleged constructive agreement. 742 F. Supp. 2d at 1092. There, as here, the defendant argued the parties had a constructive agreement, which was evidenced by the fact that the plaintiffs routinely accepted not being paid for wait time; in fact, a supporting affidavit stated workers were informed "of the hourly and piece rates and that, '[c]onsistent with . . . long-standing custom and practice[,] . . . [w]orkers were not paid for time waiting at the bus stop or traveling to the groves" and were never informed otherwise. *Id.* (alteration in original). The court noted, however, that issues such as whether the parties did indeed understand what time was and was not compensable; whether all employees were informed of the alleged policy; whether the plaintiffs complained about the alleged policy; and whether the plaintiffs "continued to work in acceptance of the alleged policy" remained unresolved. *Id.* These unresolved ambiguities, combined with the fact that the other factors weighed in the plaintiffs' favor, precluded summary judgment. *Id.*

Similarly, in this case, in arguing that a constructive agreement exists and existed during Plaintiff's employment, Defendants have submitted Brown's declaration stating, "With limited exception, Decibels does not restrict how technicians can use their time between jobs, and technicians are generally free to do as they please." Brown Decl. ¶ 9. Aside from the fact that Brown's declaration seems to indicate that "limited exception[s]" exist where technicians cannot "generally" do as they please and therefore may be entitled to pay for this time, Brown's declaration leaves many issues unanswered. Indeed, as in *Jimenez*, he does not explain when, how, or whether all employees were informed of this alleged policy. Defendants represent that technicians were trained on this policy, and while this may be true, the Court is unable to find evidence in the record to conclusively support this contention. Moreover, some technicians appear to have been confused by Decibels' pay structure, indicating a lack of agreement or

mutual understanding between the parties. *See* Hemming Decl. ¶ 20 [ECF No. 78.]. Accordingly, clear ambiguities remain regarding whether a constructive agreement exists or existed while Plaintiff was employed with Decibels. This therefore precludes the Court from granting either party's motion for summary judgment on the issue. Thus, in sum, an issue of fact exists as to whether Defendants compensated Plaintiff for all "work time" hours.

### A. Oregon's wage-and-hour law

As with the FLSA, Oregon law requires employers to compensate employees for all hours of work time. *Alvarez.*, 339 F.3d at 902. "Work time" is defined similarly under both statutory schemes. *Dusan-Speck. v. St. Charles Health Sys., Inc.*, No. 6:13-CV-00358-AA, 2013 WL 4083617, at *2 (D. Or. Aug. 9, 2013). In order to succeed under Oregon law, a plaintiff must prove that an employer knowingly allowed or required him to work uncompensated hours, just as he must under the FLSA. *See Forrester*, 646 F.2d at 414 (discussing FLSA); *Leonard v. Arrow-Tualatin, Inc.*, 76 Or. App. 120, 123-24 (1985) (discussing Oregon's wage-and-hour law).

Here, as discussed in the FLSA section above, a genuine dispute exists regarding whether Defendants knowingly failed to compensate Plaintiff for all hours of "work time." Accordingly, the Court should deny the parties' cross-motions for summary judgment on Plaintiff's Oregon-specific claim, as the same standard applies.

### II.    Whether Defendants properly paid overtime

Plaintiff's second overtime claim is confusing. He argues Defendants did not properly pay Plaintiff 1.5 times his regular rate of pay for all hours worked in excess of forty hours. When asked his basis for this contention—since Plaintiff's paystubs plainly demonstrate he was paid 1.5 times his normal rate for hours in excess of forty—Plaintiff argued that if all of the uncounted overtime hours were adequately factored in, his lawfully required wage would have

been much higher and thus he was not in fact paid 1.5 times his true hourly rate. To the extent Plaintiff alleges he was not adequately compensated for overtime hours worked because Defendants did not compensate Plaintiff for all "work time," as defined by the FLSA, this claim is redundant of his first claim for relief—addressed above—in which he claims Defendants did not "include time spent in preparing and concluding activities, travel time between jobs, or wait time between dispatched jobs in defendants' calculation of overtime." Fist Am. Compl. ¶ 24. As already discussed, an issue of fact exists as to whether Defendants paid Plaintiff for all hours considered "work time" and thus properly calculated all overtime hours worked. Indeed, if Defendants *did* fail to compensate Plaintiff for all of his "work time," then Plaintiff's hours, and by extension his overtime hours, were plainly improperly calculated, rendering his regular rate and overtime rate improper as well. But assuming arguendo that Defendants did properly compensate Plaintiff for "work time" and therefore that his paystubs accurately portray the hours he worked each week, there can be no dispute that Defendants did pay Plaintiff 1.5 times his normal rate of pay for overtime hours.

As articulated, the FLSA mandates that "employers [] compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Christopher*, 567 U.S. at 147 (citing 29 U.S.C. § 207(a)).[9] "'The keystone of [this requirement] is the regular rate of compensation. On that depends the amount of overtime payments [that] are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance.'" *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017) (alteration in original) (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)).

In *Youngerman-Reynolds*, the Supreme Court interpreted "regular rate" as "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is

---

[9]Oregon state law is identical. *See* OAR § 839-020-0030(3)(b)(B).

employed." *Youngerman-Reynolds*, 325 U.S. at 424 (internal citation omitted). "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the work week, exclusive of overtime payments." *Id.* In discerning the regular rate, the court "'must look not to contract nomenclature but to all payments, wages, piece work rates, bonuses, or things of value' that form 'part of the normal weekly income' of the employee." *Brunozzi*, 325 F.3d at 996 (quoting *Walling v. Alaska Pac. Consol. Min. Co.*, 152 F.3d 812, 815 (9th Cir. 1945)). Hence, as the court in *Brunozzi* explained:

> For employees who are paid on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources [] and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's regular rate for that week. A pieceworker is entitled to be paid the total weekly earnings at this regular rate for all hours worked and overtime equal to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week.

325 F.3d at 996 (internal quotation and citation omitted).

Here, Defendants arrived at the "regular rate" by tracking technicians' hours worked through the use of two different forms: daily reports and timecards. Daily reports track hours spent on installation jobs or traveling between jobs, and timecards track what the *Burnozzi* court defined as "all other sources"—*i.e.*, hours spent engaging in work-related activities other than installation jobs or traveling between installation jobs, such time spent at the dispatch office in the morning, in meetings, in "refresh," or on jobs that "go down." As Brown indicates, Decibels then aggregates these two payment mechanisms to arrive at an hourly rate for each workweek. Brown states that "[t]he piece rate and hourly rate compensate technicians for all regular hours worked." Brown Decl. ¶ 3. This is in line with the requirements set forth in *Brunozzi*.

Next, for all hours in excess of forty in a given week, Decibels paid Plaintiff *both* his regular rate plus a premium of .5 times his normal rate. Mathematically, this equals 1.5 times Plaintiff's regular rate. Consequently, Defendants complied with the FLSA's requirement that employers compensate employees at a rate of 1.5 times the employees' regular wages for hours in excess of forty per week. Accordingly, if it is determined that Defendants did properly compensate Plaintiff for "work time" and therefore that his paystubs accurately portray the hours he worked each week, Plaintiff's claim that Defendants did not pay him 1.5 times his regular wage for overtime hours should be dismissed.

### III.    Deductions

#### A. Cell phone

Plaintiff argues Defendants unlawfully deducted expenses for a company cell phone from his paycheck every pay period. In Oregon, an employer may not deduct, withhold, or divert any part of an employee's wages unless it is (1) authorized in writing by the employee, for the employee's benefit, and recorded in the employer's books; *or* (2) "[t]he employee has voluntarily signed an authorization for a deduction for [an] item, provided that the ultimate recipient of the money withheld is not the employer and that the deduction is recorded in the employer's books." ORS § 652.610(3)(b), (c).

As discussed, Decibels requires all technicians to have a company cell phone. Defendants claim technicians are given the option of using the cell phone for business purposes only and retaining a personal phone for private purposes or using the company cell phone for business and personal use. "If the technician only uses the cellphone for business purposes, Decibels provides the cellphone to the technician at no cost," but the technician is obligated to submit a "call log" demonstrating the phone was used only for business purposes. First Skillman Decl. ¶ 5. On the

other hand, if the technician chooses to use the phone for both personal and business purposes, "Decibels deducts approximately \$35 a month of the cost (\$17.50 per two-week pay period) from the employee's paycheck." First Skillman Decl. ¶ 5.

### 1. "Deduct" versus "charge"

Here, Plaintiff signed a form acknowledging that he "will use [his] Verizon phone for *both* business and personal calls" and that he "will be charged \$35.00 per month, at \$17.50 per paycheck." First Livett Decl. Ex. A, at 27-31 (emphasis added). Decibels recorded these deductions in its books, and the \$35 was paid directly to Verizon. *See* First Skillman Decl. ¶ 5. Hence, it would seem all elements of the statute are met. Plaintiff contends, however, that this set-up was unlawful because the form he signed indicated Decibels would "charge" plaintiff \$35.00 per month, not "deduct" \$35.00 from his paycheck.

The distinction Plaintiff makes is irrelevant. The written authorizations Plaintiff signed explicitly stated Decibels would charge Plaintiff \$17.50 "per paycheck." Hence, the parties' agreements made perfectly clear that Decibels would take \$17.50 from each of Plaintiff's paychecks. This is in line with the ORS § 652.610(3), which allows an employer to "withhold, deduct or divert"—*i.e.*, take—a portion of an employee's wages, assuming the employee has provided written authorization to do so. Nothing in that statute's language indicates an employer must use the magic words "withhold, deduct or divert" in obtaining the employee's written authorization. Whether Defendants used "charge" or "deduct," the end result was the same: Plaintiff paid \$17.50 per paycheck for the use of a company cell phone for business and personal purposes. As such, the Court refuses to read such a superfluous distinction into the statute's language. Indeed, it is revealing that Plaintiff himself uses both "charge" and "deduct"

interchangeably throughout his briefing. *See, e.g.*, Pl.'s Mot. for Summ. J., at 18 ("Mr. Wilson's wages were automatically deducted each pay period at a rate of $17.50. In April 2014, Mr. Wilson was charged $52.50, which resulted in Mr. Wilson being charged more than the total cost of the monthly cell phone plan for April 2014, which was $50.37").

Plaintiff, however, points to *Duncan v. Office Depot*, 973 F. Supp. 1171, 1179 (D. Or 1997) in arguing that this Court previously did read the restriction into the statute's language. In *Duncan*, this Court held that wage deductions were unlawful because the employee's supposed written authorization referred "only to the goals set for sales in the first part of 1996"; it made no reference to current wage deductions. *Id.* Moreover, the plaintiff in *Duncan* noted on the signature line that he had signed it under protest. *Id.* at 1179. By contrast, here, the authorization form Plaintiff signed unequivocally authorizes Decibels to take $17.50 from Plaintiff "per paycheck" and Plaintiff made no mention on the forms themselves that they were signed under protest. Accordingly, *Duncan* is inapposite.

### 2. Whether Plaintiff was overcharged

Plaintiff next argues that in April 2014, Plaintiff was charged $52.50 for his cell phone, more than the $50.37 Verizon charged that month. Plaintiff argues this proves the cell phone was not for his benefit or that the ultimate recipient of all the money was not in fact Verizon but rather Decibels, since it was charging more than the monthly cell-phone bill.

Plaintiff's interpretation of the evidence is incorrect. Pam Skillman ("Skillman"), Decibels' office manager, indicates in her declaration that "Plaintiff had three paydays in April 2014, which covered six workweeks in March and April 2014." Sec. Skillman Decl. ¶ 4 ECF No. 85.]. "Each paycheck," Skillman noted, "included a $17.50 deduction for plaintiff's personal use of his company-issued cellphone," which added up to $52.50. Sec. Skillman Decl. ¶ 4.

Plaintiff's April 2014 paystubs corroborate this. First, on April 2, 2014, Plaintiff was paid for the March 9 through March 22 pay period, and $17.50 was deducted from his paycheck. *See* Sec. Skillman Decl. Ex. 1, at 1. Second, on April 16, Plaintiff was paid for the March 23 through April 5 pay period, and $17.50 was again deducted from his paycheck. *See* Sec. Skillman Decl. Ex. 1, at 2. Finally, on April 30, Plaintiff received compensation for the April 6 through April 19 pay period, and Decibels deducted $17.50 from his paycheck. *See* Sec. Skillman Decl. Ex. 1, at 3. Hence, Plaintiff's argument that Defendants were overcharging him for his cell phone is unfounded.

### 3.  Whether the cell phone was for Plaintiff's benefit

Third, Plaintiff maintains that the cell phone was not for his benefit but instead for Decibels', as it was "necessary for the performance of Decibels business [sic] and the position as an installation Technician. . . ." Pl.'s Mot. for Summ. J., at 19. Plaintiff's assertion is unfounded. First, while ORS § 652.610(b) requires a deduction be for the employee's benefit, ORS § 652.610(3)(c)—an independent basis for deducting an employee's wages—permits an employer to deduct wages after receiving the employee's voluntary, written authorization, so long as the ultimate recipient of the money is not the employer and the deduction is recorded in the employer's books; it makes no mention of the deduction being for the employee's benefit. And, here, the ultimate recipient of the deducted money was Verizon and the deduction was recorded in Decibels' books, as proved through the submission of Plaintiff's paystubs. Therefore, as long as Plaintiff voluntarily signed an authorization allowing for such a deduction, it is irrelevant whether Plaintiff was the beneficiary of the policy.

Moreover, the evidence aptly demonstrates that the deduction was for Plaintiff's benefit. Decibels acknowledges that its technicians are required to have a company cell phone. *See*, *e.g.*,

Brown Decl. ¶ 6. This is required because technicians must be able to adequately respond to calls from customers and from dispatch. According to Decibels, however, Technicians may "choose between using the cellphone only for business purposes or for both business and personal reasons." Brown Decl. ¶ 6. If the technician chooses to use the company cell phone for dual purposes, he is required to pay $17.50 per paycheck, which is less than the actual cost of a monthly plan. By contrast, if the technician chooses to use his work phone exclusively for business, "Decibels provides the cellphone to the technician at no cost." Brown Decl. ¶ 6. The technician is then simply required to keep and submit a call log showing the cell phone has indeed been used for business purposes only.

Here, in line with this policy, Plaintiff signed three "Verizon Plan Sign Up" forms authorizing Decibels to charge him $17.50 per paycheck for use of his Verizon cell phone. *See* First Livett Decl. Ex. A, at 27-31. The forms overtly state, "I [Plaintiff] will use my Verizon phone for both business and personal calls." First Livett Decl. Ex. A, at 27-31. The phrase "business and personal calls" is in all capital letters and in bold font. Because Plaintiff received his phone at a discounted price, he received a benefit.

### 4. Whether cell-phone deductions were voluntary

Finally, Plaintiff claims that he had no choice and states in his deposition that "there's no option not to use" the work phone for both personal and business purposes. Wilson Dep. 73:9-12. Thus, he opines, Decibels' biweekly cell-phone deductions were not voluntary and he was forced to pay $17.50 per paycheck. In support, Plaintiff cites to Bradly Grout's ("Grout") declaration, in which he states his company cell phone did not function properly, requiring him to use a personal phone. Grout Decl. ¶ 16 [ECF NO. 79.]. Grout says he informed Edwards of both the phone's malfunctioning and that he did not want to pay for a company phone, to which Edwards

apparently responded "it was mandatory" that he pay for the company phone. Grout Decl. ¶ 16. Grout further maintains that Edwards did not give him the option of filling out a phone log. Ryan Hemming and Allen Essert, also technicians, additionally indicate Decibels charged $17.50 every two weeks regardless of whether technicians elected to use the phone only for business purposes. Hemming Decl. ¶ 9 [ECF No. 78.]; Essert Decl. ¶ 18 [ECF No. 81.].

While bordering on conclusory, Plaintiff's deposition testimony, when combined with the aforementioned declarations, sufficiently raises a genuine issue of fact as to whether biweekly cell-phone deductions were in fact voluntary, as ORS § 652.310(3) mandates, or whether, as Plaintiff claims in his testimony, "there's no option not to use"—and thus not to pay for—the work phone. Wilson Dep. 73:9-12. Indeed, in order for the Court to hold that Plaintiff's deductions were voluntary, as Defendants desire, it would be obligated to make a credibility determination—*i.e.*, hold that Plaintiff's deposition testimony and the declarations he has submitted in support are less credible than Defendants' evidence. Yet at summary judgment, "the court must not make any credibility determinations." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). Instead, where such a genuine dispute exists, summary judgment is inappropriate. *Id.* Accordingly, because the issue of voluntariness remains, neither party is entitled to summary judgment regarding the issue of whether Defendants' cell-phone policy was legal under ORS § 652.310(3).

## B. Tools and equipment

Finally, Plaintiff contends Defendants unlawfully deducted the costs of replacement tools and equipment from Plaintiff's paycheck. As with wage deductions for company cell phones, Decibels was not entitled to deduct, withhold, or divert any part of an employee's wages unless the deduction was (1) authorized in writing by the employee, for the employee's benefit, and was

recorded in the employer's books; *or* (2) "[t]he employee has voluntarily signed an authorization for a deduction for [an] item, provided that the ultimate recipient of the money withheld is not the employer and that the deduction is recorded in the employer's books." ORS § 652.610(3)(b), (c).

Here, Defendants maintain that wage deductions for replacement tools and equipment were lawful. It is uncontested that "[a]ll technicians [are] responsible for replacing any lost, stolen or damaged [] equipment that is due to their negligence." First Livett Decl. Ex. A, at 24. It is also uncontested that Plaintiff signed "Equipment Responsibility" forms acknowledging his awareness and understanding of this policy. *See, e.g.,* First Livett Decl. Ex. A, at 24. As Skillman explains, Plaintiff had the option of either having the cost of replacement tools and equipment deducted from his paycheck, or in lieu of this, Plaintiff was entitled to purchase replacements on his own, though as Skillman states, "Decibels is able to buy tools and equipment in bulk and often at a discount, so the cost to plaintiff was significantly less than what he might otherwise have paid" if he purchased the tool or equipment on his own. First Skillman Decl. ¶ 6.

Defendants thus contend that "[f]or most [] instances, rather than pay for the cost of the tools or equipment himself, plaintiff voluntarily signed a deduction form authorizing Decibels to deduct the replacement cost from his paycheck so that Decibels could replace the tool or equipment." Skillman Decl. ¶ 6. In support, Defendants submitted over a dozen "Voluntary Employee Payroll Deduction" forms signed by Plaintiff authorizing the deduction of various sums of money from Plaintiff's paycheck for the purpose of replacing lost or damaged tools and equipment. Kuranz Decl. Ex. 15. Defendants assert that all monies collected pursuant to these forms were distributed to the supplier of the replacement tools or equipment.

Hence, Defendants argue, because Plaintiff voluntarily authorized these deductions in writing; the deductions were for his benefit, as the replacement costs were less than what Plaintiff would have had to pay if he purchased the tools on his own; the ultimate recipient of the money was not Decibels; and all "Voluntary Employee Payroll Deduction" forms were recorded, these deductions were lawful under both ORS § 652.610(3)(b) and (c).

In contesting this argument, Plaintiff argues (1) Defendants did not obtain written authorizations for all deductions; (2) the deductions were not voluntary; and (3) because Decibels has not provided receipts for the replacement tools and equipment it supposedly purchased in bulk, there is no way of knowing whether the ultimate recipient of the money was the supplier(s) or whether the deductions were truly for Plaintiff's benefit.

## 1. Whether Defendants obtained written authorization for all deductions

First, a question of fact exists as to whether Defendants obtained written authorizations for all deductions. As Plaintiff correctly points out, $34.81 was deducted from Plaintiff's January 27, 2016, paycheck.[10] He argues Defendants have not provided an authorization form for this deduction, nor have they provided an alternative explanation for the deduction. The evidence on this matter is inconclusive; indeed, Plaintiff authorized a $34.81 deduction on November 3, 2015, for a lost or damaged tool. *See* Kuranz Decl. Ex. 15, at 12, 13. However, Plaintiff has submitted two forms purporting to be this November 3 authorization; one of the forms says this money was refunded. The other form, though, makes no mention of whether this deduction was refunded; it merely states that Plaintiff authorizes a $34.81 deduction from a future paycheck. If Plaintiff did authorize this deduction, in writing, and it was not required to be refunded, the

---

[10]Plaintiff also argues that Defendants made a deduction on October 16, 2013, prior to obtaining Plaintiff's authorization, which was provided on October 31, 2013. Plaintiff contends authorization must come prior to the deduction, though he cites to no authority supporting this argument. Aside from the fact that Plaintiff provides no support for this argument, however, the deduction occurred well beyond Oregon's two-year statute of limitations. ORS § 12.110. Accordingly, the Court declines to address the issue of this payment.

Court fails to see how Plaintiff's argument that he failed to sign an authorization form for this deduction withstands scrutiny. On the other hand, if the money was in fact refunded and Plaintiff did not later authorize the deduction in writing, then Defendants plainly failed to follow either ORS § 652.610(3)(b) and (c), since both require written authorization. Accordingly, a question of fact exists as to whether Plaintiff voluntarily authorized this deduction, precluding summary judgment for either party.[11]

## 2. Whether the deductions were voluntary

Moreover, a dispute as to whether the deductions were truly voluntary also remains. First, Plaintiff asserts in his deposition that he signed these wage deduction forms because he believed "it was a sign-or-get-fired kind of a situation." Wilson Dep. 84:3. Plaintiff claims management threatened to "take other actions" and "implied" that he would be terminated if he refused to sign these forms. Wilson Dep. 84:10-11. Additionally, declarations from other technicians support this contention. Bradly Grout, for example, states:

> My supervisor came to me on two separate occasions insisting that I sign a wage deduction form for the cost of [a missing] harness. I refused to sign the [] form, stating that it was not my fault the equipment was lost and I would not pay for the harness. My supervisor came back to me a third time and told me that I had to sign the form, and that I had no choice but to sign the form to permit Decibels to deduct the cost of the harness from my wages.

Grout Decl. ¶ 17.

Consequently, a genuine issue of fact exists as to whether wage deductions for tools and equipment were voluntary, as ORS § 652.610(3) requires. Indeed, as with the issue of biweekly cell-phone deductions, if the Court were to grant summary judgment in Defendants' favor—or in

---

[11]Plaintiff also argues that a January 6, 2016, deduction, which was made in error and later fully refunded, violated ORS § 652.610(3)(b) and (c). Plaintiff maintains these are strict liability statutes, so even a deduction made in error that is later refunded constitutes a violation. The Court finds no evidence for this proposition. Plaintiff was completely refunded for the mistaken January 6 deduction and, thus, "suffered" no violation of ORS § 652.610(3). *See Richardson v. Sunset Sci. Park Credit Union*, 268 F.3d 654, 658 (9th Cir. 2001) (stating that a "prerequisite for relief is that a plaintiff [] suffered violation of ORS 652.610(3)").

Plaintiffs'—and find that Plaintiff's deductions were voluntary—or involuntary—it would be obligated to weigh this evidence against Defendants' evidence—*i.e.*, the deduction forms themselves, which expressly state they are voluntary. This is precisely what the Court is prohibited from doing on summary judgment.

### 3. Decibels' failure to provide receipts

Finally, that summary judgment is unwarranted is only bolstered by the fact that Decibels has failed to provide receipts for the replacement tools and equipment it claims to have purchased using Plaintiff's deductions. In order to demonstrate that a wage deduction was lawful, the employer must prove either that the deduction was made for the employee's benefit or that the ultimate recipient of the money was not the employer. ORS § 652.610(3)(b), (c). Here, however, Defendants' only evidence that the deductions met these requirements is in the form of Skillman's declaration. Skillman's self-serving and conclusory statement that Plaintiff benefited from these deductions because "Decibels is able to buy tools and equipment in bulk and often at a discount," First Skillman Decl. ¶ 6, or that "[t]he ultimate recipient of the tool and equipment charge was the supplier of the tools and equipment," First Skillman Decl. ¶ 6, is, however, hardly sufficient to convince the Court that a reasonable jury could not return a verdict for Plaintiff, especially when issues of voluntariness are also considered. *Anderson*, 477 U.S. at 248.

Indeed, unlike with their cell-phone deductions, where Defendants provided the Court with monthly costs and the provider, Defendants do not indicate who all the suppliers of the tools and equipment were and what the costs were. Hence, there is no way of knowing beyond any dispute whether the ultimate recipients of the money were the tools or equipment suppliers or whether the deductions were truly for Plaintiff's benefit. Without this information, Defendants

have not met their burden of showing that no genuine dispute of fact exists as to whether Plaintiff's wage deductions were lawful. Consequently, Defendants are not entitled to summary judgment.

### 4. Plaintiff is also not entitled to summary judgment on the issue of tools and equipment deductions

Of course, Plaintiff is also not entitled to summary judgment on this issue. As with Defendants, in order for summary judgment to be awarded in Plaintiff's favor, he must show that it is beyond dispute that Defendants violated ORS § 652.610(3). As demonstrated above, however, an issue of fact exists with respect to all but the last element of the statute.[12] Specifically, as articulated, it is unclear whether Plaintiff authorized every deduction in writing and whether Plaintiff voluntarily signed the deduction authorizations. Moreover, whether the deduction was for Plaintiff's benefit or whether the ultimate recipients of the money were the tools and equipment suppliers is also disputed. Indeed, while Defendants have failed to supply sufficient evidence to demonstrate that the deductions were for Plaintiff's benefit or that the ultimate recipients of the money were the suppliers, Plaintiff has also failed to provide any meaningful evidence showing otherwise.

First, in contending that the money was not in fact paid to the equipment suppliers but to Decibels, Plaintiff points to Edwards' deposition, where Edwards explains the charge "would be on the authorized payroll deduction for reimbursing Decibels." Edwards Dep. 164:3-4. Edwards' statement is highly ambiguous. For instance, he could mean Decibels takes Plaintiff's money and ultimately provides it to suppliers and thus considers itself "reimbursed" for the cost of lost or broken tools or equipment, a procedure directly in line with the statute's requirements.

---

[12]The only issue that appears unchallenged is that each deduction was recorded in Decibels' books. Indeed, it appears indisputable that Decibels recorded deductions: it retained copies of each authorization form and recorded the deductions and what they were for, including the deduction for $34.81, in its pay records and on paystubs.

Alternatively, he could indicate Decibels keeps the money, an interpretation that would seem to be in contravention of the statute. Such ambiguous language does nothing to show there is *no* genuine dispute; it helps create one. Accordingly, this evidence is insufficient to demonstrate Plaintiff is entitled to summary judgment on this issue.

Finally, in support of his assertion that these deductions were not for his benefit, Plaintiff directs the Court to a single instance in which his wages were deducted for the cost of damages Plaintiff allegedly caused to a customer's Xbox. Kuranz Decl. Ex. 15, at 10. By charging him for these damages, Plaintiff maintains that Decibels was relieved from the burden of having to file an insurance claim, while he received no concurrent benefit. While this may be true, it does nothing to demonstrate that the myriad of other deductions Defendants have shown Plaintiff authorized were not for his benefit. And, as for the damaged Xbox, as long as Defendants met part (c) of ORS § 652.610(3), the deduction for Xbox damages did not need to be for his benefit. Accordingly, this single occurrence does not conclusively show Defendants violated ORS § 652.610(3). Consequently, in sum, a jury could easily return a verdict for either party as to this issue. *Anderson*, 477 U.S. at 248. Both parties' summary judgment motions should therefore be denied.

## RECOMMENDATION

For the reasons stated above, Defendants' summary judgment motion (#72) should be GRANTED in part and DENIED in part and Plaintiff's summary judgment motion (#76) should be DENIED.

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See*

Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

It is so ORDERED and DATED this _____//_____ day of September, 2017.

MARK D. CLARKE
United States Magistrate Judge